MONCURE, P.,
delivered the opinion of the court.
This is a writ of error to a judgment of the county court of Bedford county, rendered on the 37th day of March, 1880, condemning the plaintiff in error, Peter Wright, for murder in the first degree, of which he had just been convicted in the said court, and sentencing him to be hung therefor. A petition was presented by the said plaintiff in error to the judge of the circuit court of said county for a writ of error to the said judgment of the said county court, which was denied by the said judge. And thereafter a petition was presented by the said plaintiff in error to the judges of this court for a writ of error to said judgment, which writ of error was thereupon awarded. The question presented to this court by the said petition to the judges *629 thereof, and the record of the proceedings in the case of which a copy accompanies the said petition, is whether there be error in the said judgment or not, for which the same ought to be reversed.
There are two, and only two, assignments of error in the said petitions, which wilt be considered and disposed of in the order of the said assignments.
The first is, in refusing to grant said petitioner a change of venue.
The following appears from the record to be the state of the case in regard to this assignment of error:
“At the county court continued by adjournment and ¡held for Bedford county at the courthouse on Wednesday *the 25th day of February, A. D. 1880, Peter Wright, who stands indicted for murder, was again led to the bar in custody of the sheriff of this county, and the prisoner by his counsel moved the court for a change of venue to the county court of some adjacent county; which motion was defended by the attorney for the Commonwealth, and being argued, the court doth overrule said motion; and on the motion of the prisoner, and for reasons appearing to the court, it is ordered that his trial be postponed until the next term of the court.
“And at another day, to-wit: at a county court continued by adjournment and held for Bedford county at the courthouse, on Tuesday the 23d day of March, A. D., 1880, Peter Wright who stands indicted for murder, was again led to the bar in custody of the sheriff of this county, and the prisoner by his counsel moved the court for a change of venue to the county court of some adjacent county; which motion was defended by the attorney for the Commonwealth, and being argued, the court doth overrule said motion; and the writ of venire facias awarded for the trial of the prisoner being returned according to law, the court proceeded to impanel a jury for his trial, and a panel of sixteen jurors, free from exception, being formed according to law, the prisoner struck therefrom the names of four persons, leaving the remaining twelve persons to compose the jury for his trial, to-wit: (here follow the names of the jurors) who were duly sworn to well and truly try and true deliverance make between the Commonwealth and the prisoner, and a true verdict render according to the evidence. And having heard the evidence in part, the said jury were, with the consent of the prisoner, committed to the custody of the sheriff of this county, who is directed to keep them together without communication with any other *person, and to cause them to appear in court to-morrow morning at nine o’clock; and thereupon an oath was administered to two deputies of the sheriff of said county, to the following effect: ‘You shall well and truly, to the best of your ability, keep this jury, and neither speak to them yourself nor suffer any other person to speak to them touching any matter relative to this trial until they return into court to-morrow morning;’ and the prisoner is remanded to jail. And
“At another day, to-wit: at a county court continued by adjournment and held for Bed-ford county at the courthouse on Wednesday, the 24th day of March, A. D., 1880, Peter Wright, who stands indicted for murder, was again led to the bar in custody of the sheriff in this county, and the jury adjourned on yesterday were brought into court in charge of the sheriff of this county, pursuant to their adjournment; and the said jury having fully heard the evidence and arguments of counsel, retired to their room to consult of a verdict, and after sometime returned into court and upon their oath do say: ‘We the jury, find the prisoner, Peter Wright, guilty of murder in the first degree,’ and the prisoner is remanded to jail.”
To the said opinion of the said county court, overruling the motion of the prisoner for a change of venue as aforesaid, he filed a bill of exceptions, which was signed, sealed and ordered to be made a part of the record, and is in the words following to-wit:
“Be it remembered that upon the trial of this case, and before the jury were impaneled, the prisoner, by his counsel, moved the court for a change of venue from this to some other county court of this Commonwealth; but the court overruled said motion; to which opinion of the court the prisoner excepts, and prays that this, his bill of exceptions may be signed, sealed -’‘and made a part of the record; which is accordingly done. And to save the prisoner the benefit of his exception, certifies that the prisoner, in support of his said motion, offered the following affidavits, which are in the words and figures following, to-wit:
“Affidavit No. i.
“This day personally appeared before me, J. Morton Speece, a deputy clerk of the county court of Bedford, Peter Wright, who stands indicted in said court for murder, and made oath that he has reasons to believe and does believe that there exists throughout this entire community and in the county of Bed-ford great prejudice against him; that so great is this prejudice that he believes it would be utterly impossible, were he again put upon trial here, to obtain a fair and an impartial verdict at the hands of a jury of this county; that at the trial heretofore had this court was unable to obtain such a jury as the law requires, on account of this very prejudice; that at the time said trial was had, various rumors and newspaper reports of his case were circulated throughout the county, to such an extent as to be known, as this af-fiant is informed and believes, to nearly every citizen in the county; that several months having elapsed since said trial, these reports and rumors have become more widely circulated, and at this time he believes that «there cannot be found a single citizen in this county who has not either expressed a decided opinion or fully made up his mind as to the guilt or innocence of this affiant, and in nearly every case to his prejudice.
“Your affiant states that he does not file, as he would wish to do, affidavits from citizens of this county in support of the facts herein *630 stated, for the reason he is a poor colored man that has been unable, on account *of extreme prejudice, to obtain such affidavits; that his counsel have made oft and repeated efforts to obtain from citizens of this county their affidavits to the truth of these statements; that in nearly every case these “citizens have openly expressed the opinion that a fair and impartial trial cannot be had within the county by a jury of the county, but on account of public opinion they decline to allow their affidavits to be used in this case, so great is their prejudice against this affiant.
This affiant further states that, in view of these facts, he does not think that he could go safely into trial here; that he will be again put upon trial for his life, and for this reason he believes that he should be granted every privilege the law in its mercy allows, and he believes that this court being cognizant of these facts ought not and will not permit this affiant to be tried by a jury of this county.
“Given under my hand this the 27th day of January, 1880.
“J. Morton Speece, D. Clerk.”
“Affidavit No.,2.
“Virginia — city of Tynchburg, to-wit:
“This day Peter Wright made oath before me that he has been credibly informed and believes that there is great prejudice against him in the county of Bedford; that it has been publicly manifested in the newspapers by a publication by one. of the jury that tried him; that there have been moves in the county to lynch him, and that this prejudice was exhibited by the vast crowd of citizens of Bedford that attended his trial; that two veniries of 48 men and some- twenty bystanders .were required to be summoned to procure the jury that tried him, and that each and all of the panel were i challenged for cause, and he is ad-: vised *that the court of appeals decided that he did not then get an impartial and fair jury. He verily believes that not only can he not get a fair trial in the county of Bedford, but that his life is not safe if kept and tried in said county.
“Given under my hand this 7th Feb’y, 1880.
“Andrew J. DeWitt, Notary Public.”
“Affidavit No. 3.
“This day personally appeared before me, J. Morton Speece, deputy clerk of Bedford county court, Graham Claytor, that he is of counsel for the prisoner, Peter Wright, who stands charged with murder in said court, and made oath that as such counsel he has made repeated efforts to obtain from the citizens of this county affidavits to th<; effect that the prisoner cannot get a fair trial in this county on account of prejudice existing against him; that the parties to whom he applied in nearly every case expressed the opinion that the prisoner could not obtain a fair trial in said county, but they declined to give their affidavit to the facts on account of the odium attached to the case and on account of public opinion — so great is the prejudice against the prisoner.
“Given under my hand this the 22d of March, 1880.
“J. Morton Speece, D. Clerk.”
This court is of opinion that the said county court did not err in overruling the motion Of the prisoner for a change of venue as aforesaid. It does not appear from the record, nor from anything therein contained, that he did not have a perfectly fair and impartial trial on the occasion when the verdict and judgment were *rendered against him as aforesaid, to which judgment the writ of error was awarded in this case as aforesaid, to-wit: the judgment rendered on the 27th day of March, 1880. There had been a former trial in the case, in which a verdict and a judgment in the same words or to the same effect had been rendered in the same county against the same prisoner for the same of-fence; and that judgment had been reversed by this court upon the ground, and only upon the ground, that one of the veniremen on the said former trial, to-wit: Charles W. Hardy, was not a competent juror for the trial of the plaintiff in error, and that therefore the county court erred in overruling; his objections to said Hardy, based upon said incompetency. It was therefore considered by the court that the said judgment of the county court for the error aforesaid be reversed and annulled, the verdict of the jury set aside, and a new trial awarded the plaintiff in error; on which new trial in the same case and in the same court, anothér verdict and judgment were rendered in the same words or to the same effect; the said judgment being the same to which the writ of error in this case was awarded as aforesaid. That there was one incompetent juror on the first trial of the case, was no good ground, in itself, for considering that a competent jury could not be obtained in the case in the said county of Bedford. If it had been, the difficulty might no doubt have been removed, by summoning from another county so many duly qualified jurors as could not be found in the county in which the trial occurred. There was no such attempt made thus to remove such a supposed difficulty, but instead of that, there was a motion for a change of the venue. The facts of the case as they appear in the record, show that a perfectly competent jury could be, as one such wag in fact, summoned in the county and empaneled for the final trial *of the case. To not one of the twelve jurors who finally tried it, was the slightest objection assigned, either in this court or in the court below. The conclusive presumption therefore is, that there was no ground for any such objection. and that the ground now taken by the plaintiff in error, that his motion to change the venue ought to have been sustained, is wholly unfounded.
The only evidence introduced by the prisoner in support of his motion for a change of venue as aforesaid, consisted of three affidavits, two of which were those of the prisoner himself, and the third that of the pris *631 oner’s counsel. It is not stated in the said affidavit of the said counsel, that he believed the prisoner could not obtain a fair trial in the said county. Even if it had been so stated, there is nothing in the record to show that any difficulty which might have existed in obtaining a fair and impartial jury in the county might not have been removed by causing so many jurors as might have been necessary to be summoned from any other county or corporation. If such difficulty could have been so removed, there was, of course, no necessity for a change of venue. But no motion was made by the prisoner for a ve-nire facias to summon jurors from another county or corporation; and indeed there was no occasion, so far as the record shows, for any such venire facias. On the contrary it appears that a fair and impartial jury was actually obtained in the said county.
The court below therefore clearly did not err in refusing to grant the plaintiff in error a change of venue.
The second and only remaining assignment of error is. that “the verdict of the jury should have been set aside and a new trial granted, because the verdict was contrary to the law and the evidence.
^Another bill of exceptions was made a part of the record in this case, which states “that upon the trial of this cause and after the jury had rendered their verdict, the prisoner by his counsel, moved the court to set aside the verdict of the jury and grant the prisoner a new trial upon the ground that the verdict was contrary to the law and the evidence; but the court overruled the said motion and refused to set aside the verdict and grant the prisoner a new trial. To which opinion of the court so overruling said motion, the prisoner by counsel excepts, and prays that his bill of exceptions may be signed and sealed by the court and made a part of the record; which is accordingly done. And to save the prisoner the benefit of the exception, the court certifies that the following is the evidence and the whole of the evidence which was produced upon said trial by witnesses introduced by the Commonwealth:
The first witness, Carr Maupin, said: “I am the father of the deceased. I live in Bedford county, about 3>4 miles south of Liberty. Peter Wright, the prisoner, who was a tenant of mine, under our contract he was to have one-half of the crop of oats, corn and tobacco. I was to furnish one mule and he one — he to haul and sell the wood from the new ground and to pay me one-half of the proceeds every night. Peter Wright had been hauling wood out of my new ground and pocketing all the money. I went over to the new ground in the afternoon. I told him he must stop; that he was neglecting his crop and keeping the money; if he didn’t I would get some one to work his crop for him. He replied, ‘I will haul the last stick away.’ I observed to him that he would have to haul it without my mule. I started home and the prisoner said, ‘God d — n your old soul, I intend to kill you anyhow.’ He then *knocked me down with his fist and beat me as long as he saw proper. The prisoner’s son, a boy about 13 years old, hollowed to prisoner ‘not to beat me any longer, he had beat me enough’ — he stamped me just below the stomach. I went to the wagon to unhitch the breast chain of my mule and saw my son, (the deceased), coming through the tobacco, and as he came up said, ‘Peter what in the world are you beating my father this way for?’ Prisoner then turned round and snatched the standard from the wagon and struck me and knocked me down, and then whirled and knocked my son down. When he struck me I caught the lick with my hand, but the lick struck me on the head and knocked me down. I law on the ground, T do not know how long, and when I got up I said, ‘Peter you have killed my son,’ and prisoner replied, 1 am glad of it, (or damn glad of it, I don’t know which). Peter then unhitched his mule and gave the harness to his daughter and went down the branch towards Liberty, Va., and gave himself up. This is the standard with which he struck me and with which he killed my son. (Here the standard was produced, which is a dogwood standard, 3)4 or 3 feet long, 1)4 inches in diameter.) This was the last of June or 1st July, J879, in the county of Bed-ford. Neither of us struck him or offered to strike him. I was not able to do so. We made no resistance or offered to make any. I know of no personal ill-feelings up to that time between me and prisoner or between the prisoner and deceased. I was unarmed when the difficulty occurred. The prisoner was also unarmed, but if I had had a pistol I would have killed him. if I had been able to do him justice.”
The second witness, Lydia Early (a woman of color), said: “I live about 100 yards from the place where the difficulty occurred. I had two little children over there *where difficulty occurred. My little girl who was in the yard came into the house and said that Mr. Carr Maupin and Peter were quarreling at the wood-stack. I went out doors and sat down by the table, and heard Carr Maupin say, you pocket all my money and pay me none. Peter says, ‘I am going to haul that stack of wood.’ Carr Maupin says, ‘I am going to take out my mule.’ Peter said, ‘Let that mule alone.’ Carr Maupin went to unhitch his mule. Peter knocked him down and stamped him, and says, ‘Damn your old soul, I’ll kill you.’xBy this time Robert Maupivi (the deceased) came running up with open hands, and says: ‘Hey there; don’t you hit my father any more.’ Peter’s little boy says, ‘Father, don’t fight; you can do without all that fighting.’ As Robert Maupin ran up Peter snatched the wagon standard and knocked old Mr. Maupin down, and turned and knocked Robert Maupin down. Mr. Carr Maupin lay there from 4 to 5 minutes before he got up. Robert Maupin did not get up at all. Peter Wright stayed long enough to divide his gear from Mr. Carr Maupin’s; he gave his harness and his horse to his girls who had come up at that time. Peter then went down the creek towards town. Neither of the Maupins as far as I *632 saw had any rock or stick. I did not see the beginning of the difficulty. I was in my house when the difficulty commenced. They were talking very loud. Maupin generally talks loud. The whole fight from the beginning to end was in less time than ten minutes. Robert Maupin, the deceased, was a grown man, and about as stout as the prisoner, I have never heard of any ill-feeling between Peter and Robert Maupin. They all thought a great deal of Robert Maupin.”
The third witness, Dr. Walter Izard, said:
“I was the physician called to see the deceased; arrived on the ^ground about an hour or two after the difficulty, and found him insensible and speechless; had blecj freely from the wound on his head, and might have-produced by the stick here produced. I had him removed to his father’s house, and did not see him again until the next morning when I found him dead (about 9 A. M.). Upon making a post mortem examination I found the skull badly fractured, the fracture extending some three inches. The wound inflicted was the cause of his death. I regard the standard used a deadly weapon in the hands of a man like the prisoner.”
This court is of opinion that the said county court did not err in overruling the motion of the prisoner to set aside the verdict of the jury and grant the prisoner a new trial upon the ground that the verdict was contrary to the law and the evidence. There is no doubt but that the killing in this case was murder; and the only question is, was it murder in the first degree, as it was found by the jury upon the evidence?
“Murder by poison, lying in wait, imprisonment, starving, or any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit arson, rape, robbery or burglary, is murder of the first degree. All' other murder is murder of the second degree.” Code of 1873. p. 1188, ch. 187, § 1. The killing in this case was not “by poison, lying in wait, imprisonment, starving,” “or in the commission of, or attempt to commit arson, rape, robbery or burglary”; and the only question therefore is, whether it was a “willful, deliberate and premeditated killing?” If it was, it was murder in the first degree.
The court is of opinion that it was a willful, deliberate and premeditated killing, and therefore it was murder in the first degree. At all events, the jury were warranted *by the evidence in so finding, whatever the judge of the county court or of the circuit court or the judges of this court might have found if they had been on the jury. To constitute a willful, deliberate and premeditated killing; it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should come into existence for the first time at the time of such killing or any time previously.
Now in this case, we must regard the evidence as facts, as the jury might have regarded it. The parties when the altercation commenced were all unarmed; and Carr and Robert Maupin remained unarmed to the end of the transaction. No attempt or threat was made by either of them to do violence to the prisoner. No harsh word was spoken by either of them to him. Carr Maupin testified: “I started home, and the prisoner said, ‘God damn your old soul, I intend to kill you anyhow.’ He then knocked me down with his fist and beat me as long as he saw proper. The prisoner’s son, a boy of about 13 years old, hollowed to prisoner ‘not to beat me any longer, he had beat me enough;’ he stamped me just below the stomach. I went to the wagon to unhitch the breast chain of my mule, and saw my son, the deceased, coming through the tobacco, and as he came up said, ‘Peter, what in the world are you beating my father this way for? Prisoner then turned round and snatched the standard from the, wagon and struck me and knocked me down, and then whirled and knocked my son down. When he struck me, I caught the lick with my hand, but the lick struck me on the head and knocked me down. I lay on the ground, I do not know how long, and when I got up I said, ‘Peter you have killed my son,’ and prisoner replied, T am glad of it (or damn glad of it, *1 don’t know which).’ This is the standard with which he struck me, and with which he killed my son. (Here the standard was produced which is a dogwood standard, 2J4 or three feet long. 1J4 inches in diameter). Neither of us struck him or offered to strike him. I was not able to do so. We made no resistance or offered to make any. I know of no personal ill-feelings up to that time between me and the prisoner, or between the prisoner and deceased. I was unarmed when the difficulty occurred. The prisoner was also unarmed, but if I had had a pistol I would have killed him, if I had been able to do him justice.”
Lydia Early’s testimony was strongly confirmatory of that of Carr Maupin and need not be repeated.
Dr. Walter Izard testified: “I was the physician called to see the deceased; arrived on the ground about an hour or two after the difficulty, and found him insensible and speechless; had bled freely from the wound on his head, and might have been produced by the stick here produced. I had him removed to his father’s house, and did not see him again till the next morning, when I found him dead (about 9 A. M.). Upon making a post mortem examination, I found the skull badly fractured, the fracture extending some three inches. The wound inflicted was the cause of his death. I regard the standard used a deadly weapon in the hands of a man like the prisoner.”
It seems plain enough, without any further comment, that the evidence warranted the jury in finding the verdict they did.
The court is therefore of opinion that there is no error in the judgment and that the same ought to be affirmed.
It is unnecessary to review the cases and the authorities referred to by the counsel for the plaintiff in error. *There is nothing in them in conflict with the conclusion at which the court has arfived in *633 this case. There is one very recent decision of this court in which the five judges thereof were unanimous, in a case very similar to the present in most of its facts, which is conclusive upon the question that the court below did not err in overruling the motion of the prisoner to set aside the verdict of the jury and grant the prisoner a new trial upon the ground that the verdict was contrary to the law and the evidence. That case was Nelson Mitchell v. The Commonwealth, supra 872.
There is an important difference between that case and this in the fact that in that case the killing was preceded by an assault and battery committed by the deceased upon the accused just before the former was killed by the latter. Whereas in this case, the deceased made no assault on the accused at or about the time of the killing or any other; made no threat against him; had no weapon in his hand; and merely enquired, “Peter, what in the world are you •beating my father this way for?” It appears that there never had been any ill-feeling between Peter and Robert Maupin, and that all thought a great deal of Robert Maupin. The killing then was an act of wanton cruelty; in effect without any provocation at all.
There is no doubt but that the prisoner intended to kill the deceased; and that he had not the least ground of justification or excuse for doing so. -The act of killing was done with a deadly weapon, which is fully described in the evidence. With it he badly fractured the skull of the deceased, giving to it a fracture extending some three inches, which was certainly the cause of the death of the deceased; and it must have been known to the prisoner that the blow thus given by him would be the cause of the death of the deceased. There *was no personal ill-feeling up to that time between Carr Maupin, the father of the deceased, and the prisoner, or between the prisoner and deceased. Both Carr Maupin and his son, the deceased, were then unarmed, and neither of them made an assault upon, or attempted or made any threat to assault the prisoner. Carr Maupin started home and the prisoner said, “God damn your old soul, I intend to kill you anyhow.” The prisoner then knocked the father down with his fist and beat him as long as he saw proper; he stamped the father just below the stomach. The latter went to the wagon to unhitch the breast chain of his mule, and saw his son (the deceased) coming through the tobacco, who, as he came up, said, “Peter, what in the world are you beating my father this way for?” Prisoner then turned round and snatched the standard from the wagon and knocked the father down; and then whirled and knocked the son (the deceased) down. The father lay on the ground some time. He would, no doubt, have been killed if he had not caught the lick with his hand. When he got up he said, “Peter,_ you have killed my son”; and prisoner replied, “I am glad of it (or damn glad of it, the witness did not know which).” It appears that there never had been any ill-feeling between the prisoner and the deceased, and that all who knew the deceased thought a great deal of him. I to was certainly the duty of the deceased to interpose and save his father from death or great bodily harm. He indicated no purpose to do anything else, but the contrary. He hjd no weapon, made no assault upon or threat against the prisoner, but only enquired as he came up, “Peter, what in the world are you beating my father this way for?” and then without any further provocation the prisoner killed the deceased with a deadly weapon! *We say that the jury were warranted by the evidence in finding this to be murder in the first degree, as they did; and that the judgment of the court below ought not to be reversed, but ought to be affirmed, which is adjudged accordingly.
Judgment affirmed.